## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DERIC W. PRESCOTT                                )
5910 Instone Circle                              )
Colorado Springs, CO 80922                       )
                                                 )
                    *Plaintiff*,                 )
                                                 )
           v.                                    )          Civil Action No.
                                                 )
UNITED STATES,                                   )
                                                 )
                    *Defendant*.                 )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
### (Collateral Review of Court-Martial Conviction)

## INTRODUCTION

This is an action for collateral review of an unconstitutional conviction by a general court-martial.  The case raises two due process issues under the Fifth Amendment:  (a) whether the convictions for attempted larceny and false official statement are legally sufficient when the Government failed to prove certain essential elements beyond a reasonable doubt and (b) whether the military courts erred in denying the petition for a new trial based on newly discovered evidence of Plaintiff's diagnoses of Post-Traumatic Stress Disorder and Obsessive Compulsive Disorder which, if considered by the court-martial in light of all other pertinent evidence, would probably produce a substantially more favorable result for Plaintiff.  The case also raises an ineffective assistance of counsel issue under the Sixth Amendment.

## JURISDICTION

1.      The Court has jurisdiction under 28 U.S.C. §§ 1331.  The federal questions arise under the Due Process Clause of the Fifth Amendment; the Assistance of Counsel Clause of the Sixth Amendment; 10 U.S.C. § 873; and Rule for Courts-Martial [R.C.M.] 1210(f)(2), which is a

binding provision of the *Manual for Courts-Martial, United States* (2016 ed.) [MCM], an Executive Order with the force of law.

## VENUE

2.      Venue is proper in this district.  28 U.S.C. §1391(e).

## PARTIES

3.      Plaintiff was a Lieutenant Colonel in the United States Air Force.  His pay grade was O-5.  He resides at the address in the caption.

4.      Defendant is the United States and the opposing party in Plaintiff's court-martial, captioned *United States v. Prescott*.

## FACTS

A.      Household Goods Claim

5.      In 2011 and 2014, Plaintiff submitted household goods claims in excess of $30,000 after those permanent change of station [PCS] moves.  These claims were investigated by inspectors from the respective moving companies or insurance agencies.  The inspectors personally examined each claimed item to verify damages and to determine the cost of repairs or replacements.  The inspectors concluded that Plaintiff's claims were not abnormally high and neither inspector reported anything memorable about these claims.

6.      Plaintiff settled the 2011 claim for $16,309.22.[1]  In that claim, he sought reimbursement for a Fender speaker with damage described as "rear plug/outlet broken off/cracked."

---

[1] Over defense objection, the military judge admitted evidence of the 2011 claim to prove a common scheme or plan for the 2014 and 2017 claims, to demonstrate Plaintiff's knowledge of the claims process, and to rebut a contention that the alleged were offenses were the result of accident or mistake.

7.    Plaintiff settled the 2014 claim for $20,538.34.  For this claim, Coleman Worldwide Group [CWG] verified the claimed damages.  CWG determined that Plaintiff did not inflate the purchases prices for his claimed items and he sought less money than what he paid for the items. CWG later paid Plaintiff an additional $6,996.90 after the Military Claims Office [MCO] determined that he should be compensated for other items damaged during the same move but that CWG had previously declined to pay.

8.    Total Military Management [TMM], a move management company under contract with the Department of Defense, was assigned to coordinate Plaintiff's 2016 move from San Antonio, Texas, to Minot, North Dakota.[2]  Prior to packing a single box, TMM and its subcontractors were wary of Plaintiff's prior claims, despite the lack of any apparent misconduct by Plaintiff.  Accordingly, the personnel responsible for packing, moving, and delivering Plaintiff's household goods were warned that he may try to file another claim and were instructed to pay especially close attention to the move by inventorying everything correctly, taking pictures prior to packing or moving goods, and exercising diligence in documenting any items with pre-existing damage.

9.    Plaintiff expressed "legitimate concerns" for the impending move, based on the damages and losses from his prior moves, and requested a "Code 2" shipment.  Such a method would supposedly better protect his possessions because it required the packers and movers to place his goods in wooden containers, seal them at his residence, and open them only upon delivery at the final destination.  This method was not foolproof, however, because theft and pilferage could still occur, and a study indicated that Code 2 moves resulted in only a five percent decrease in

---

[2] The Department of Defense [DoD] awarded the contract to Day Transfer, the Transportation Service Provider.  Day Transfer subcontracted the move to TMM, who then subcontracted portions of the move to Lone Star Relocations [LSR] and AAction Movers.

pilferage compared to moves utilizing regular boxes and vans.

10. TMM and its subcontractors made numerous mistakes during the move: at least 91 of 322 items were incorrectly inventoried[3]; there were issues with the storage of Plaintiff's goods in the warehouse[4]; some of the seals on the shipping crates were broken or were missing altogether, possibly indicating that they had been opened; and several items were missing on the date of delivery, including the box containing parts necessary for reassembling Plaintiff's furniture.

11. JM, the lead packer for LSR, had been instructed to pay extra special attention to her crew's work on Plaintiff's move so as to avoid another claim. This extra special attention included correctly completing an inventory on all items, with proper exception codes documented to indicate preexisting damage, and photographing such items prior to moving them out of the house. Following these instructions, JM took numerous pictures and annotated multiple exceptions.

12. Plaintiff believed that JM used incorrect exception codes on some items. For example, he believed a chip on a bookshelf should be annotated as "chipped" rather than as "badly worn." Nonetheless, JM did not allow Plaintiff to influence her categorization decisions and she continued to annotate anything that she considered to be "scratched, chipped, worn, [or] broken."

13. Among the items JM included in her inventory were two Fender speakers, both of which she annotated as "dented," but whose mechanical condition she listed as "unknown." JM did not list either as "broken," and it appeared that she photographed only the front of one speaker.

---

[3] LSR was the origin agent for Plaintiff's move. As the origin agent, LSR was responsible for packing and loading Plaintiff's goods. LSR later received a negative citation from the Department of Defense [DoD] for errors in the inventory of Plaintiff's household goods.
[4] Plaintiff's household goods were stored at AAction Movers' warehouse, which the DoD had placed under surveillance for a period and inspected more frequently than other warehouses due to mistakes the company had made in the past.

14.     The AAction Movers' supervisor maintained that the crates containing Plaintiff's household goods were in good condition at the warehouse in that they had metal bands around them, along with intact plastic seals for quality assurance.

15.     A broken seal could indicate that Plaintiff's crates had been tampered with or that someone had opened them.  QT, the Air Force quality control inspector who oversaw Plaintiff's move, testified that crates can be opened overnight in multiple ways, even without someone removing the seals.

16.     Despite the AAction Movers' assertion that the crates were in good condition, QT observed that at least one seal had been broken or removed.  A senior AAction Movers employee conceded that photographic evidence indicated that at least two seals were missing from a crate.

17.     Plaintiff complained about the state of his possessions upon their August 22, 2016, arrival, noted the broken seals, and catalogued several missing or damaged items.  Accordingly, he did not sign the inventory paperwork and the movers took it with them.  Without the inventory paperwork, Plaintiff was unable to immediately itemize what he believed was missing.

18.     Plaintiff signed the inventory on October 3, 2016, but the carbon copy was not lined up with the original, which resulted in checked boxes and signature blocks in the original form appearing in spaces below on Plaintiff's copy.

19.     Using the misaligned carbon copy, Plaintiff filed a household goods claim against TMM for $41,518.00, including a claim for $649.00 for a Fender speaker with damage described as "Backoutlet smashed in."

20.     In this 2017 claim, Plaintiff included items he knew were missing even if they were marked delivered on his inventory when he knew the inventory was incorrect.  For example, although Plaintiff's copy of the inventory indicated that a particular lawnmower had been

delivered, he claimed it as missing because he knew the inventory was wrong.

21.     Plaintiff attested that he did not intentionally claim any item that was listed as missing if he knew it had been delivered.  Nonetheless, he made mistakes regarding several items, including filing a claim for missing items from his filing cabinet that were listed as not delivered on his inventory but which had actually been delivered and verified.  The government's inventory did show that there was a box missing that was not delivered that also contained items from a filing cabinet showing an honest mistake in the number of the item, but confirming that an item was not delivered.

22.     As he did with his 2011 and 2014 claims, Plaintiff sought the full replacement value for every item that was lost or destroyed, even if the damage consisted of scratches or tears. Plaintiff based his claimed amounts pursuant to prices listed on Google, Wayfair, and other websites.  With just two exceptions, none of the amounts he claimed exceeded the purchase cost of his items.  More often than not, the claimed amount was far less than the purchase price.  This practice was expressly permitted by the claims process and the governing regulation.  Indeed, KF, the TMM Director of Claims, confirmed that it is typical for claimants to determine full replacement value by utilizing list prices from Google.

23.     When he filed his claim, Plaintiff understood that TMM would not necessarily pay him what he asked.  Instead, the company could offer him a lesser amount or even nothing at all. Accordingly, Plaintiff approached the claims process as a negotiation whereby, as an opening salvo, he sought the maximum amount possible.

24.     TMM personnel were skeptical even before Plaintiff filed this claim because they believed it was nearly impossible for so many items to be missing in a Code 2 shipment.  They later found what they believed to be similarities in Plaintiff's previous claims, specifically, that he

had earlier sought compensation for the same damage to some of the same items.

25.     They were still skeptical even after their inspector, MP, visited Plaintiff's residence and verified the claimed damaged and missing items, while noting only two minor potential discrepancies.

25.     Among the damaged items, the inspector examined a speaker and confirmed that it had a missing input on the right side.

26.     TMM did not tell MP about Plaintiff's previous claims, nor did the company provide him with photos from those claims which would have aided him in determining whether there was pre-existing damage to the items claimed by Plaintiff.  Accordingly, MP treated the inspection like any other.  He took photos of the claimed items, discussed the damages with Plaintiff, and took notes for his later report.

27.     Although MP found it odd that Plaintiff owned so many floor lamps, the inspection was otherwise normal and he did not report anything significant about Plaintiff's claim.  MP relayed to TMM that the number of claimed items was higher than normal, but he acknowledged that some people are pickier about their belongings than others and file claims for minor damage.  Ultimately, MP verified the damaged and missing items and noted just two discrepancies:  (a) three separate claims for different damages to one table (the packers gave a separate inventory number for each table leg and the table itself) and (b) scratches to a treadmill that could not be conclusively classified as new or not.  There was no rule prohibiting multiple claims for damage to a single item if, for example, there were three separate and distinct gouges to a dining room table.

28.     MP inspected a speaker, which he confirmed had a missing input on the right side.

29.     Despite the inspector's report, TMM believed that Plaintiff's claim was fraudulent because of the size of the claim, the manner of the move, and the supervision – by both the

company and the Government – over it.

30.     TMM had Plaintiff's 2011 and 2014 claims.  Plaintiff had made TMM aware of these claims himself, telling them he had experienced bad moves in the past which resulted in high claims.

31.     TMM had options regarding Plaintiff's 2017 claim.  It could have denied the claim in whole or in part, even if it believed portions of it were legitimate, or offered to settle the claim for a lesser amount.  It could have adjudicated each claimed item separately.  It could have offered to settle the claim for an amount it believed was fair.  The company could have sought additional information from Plaintiff, especially regarding the items he claimed were damaged on both this move and prior moves.

32.     Ultimately, TMM denied the entire claim.

33.     Upon TMM's denial, Plaintiff filed a claim with the Military Claims Office, the claims office of the Air Force.

34.     When a TSP or its subcontractor denies a claim partially or in full or fails to offer a servicemember satisfactory compensation, the servicemember can continue to negotiate with the TSP or transfer the claim for adjudication by the MCO.  Prior to a transfer to the MCO, the servicemember is advised that s/he will receive less compensation because the MCO will automatically depreciate the value of any claimed item that is more than six months old. Additionally, the transfer of a claim to the MCO notifies the TSP that the servicemember will cease negotiating with it.

35.     TMM contacted the Air Force Office of Special Investigations to share its suspicions about Plaintiff's claim.

36.     During its meeting with OSI, TMM brought KF, its claims expert, to explain the

company's position.  OSI did not have a claims expert present, so PD, the lead investigator – who had been an agent for approximately six months, had never worked a case involving fraud allegations, and was unfamiliar with many of the terms and definitions provided by TMM – relied on TMM to explain moving industry practices and procedures.

37.     KF did not inform OSI that TMM's own paperwork indicated that 91 items were missing from the point of origin and that 51 items were missing at the destination.

38.     While TMM complained to OSI that Plaintiff's claim against the company sought compensation for the same damage to items he had included in earlier claims, KF did not explain that the rules permitted customers to file claims on previously repaired items with new damage.

39.     PD, the lead investigator, reviewed Plaintiff's three household goods claims, the inspections for these claims, and the inventories from each move.  The documents revealed that Plaintiff owned multiples of the same items, such as dozens of floor lamps, numerous televisions and computers, cat towers, and hundreds of Beanie Baby stuffed animals.   PD found this unusual and wanted to interview Plaintiff.

40.     At the time, Plaintiff served as the Staff Judge Advocate, the top legal advisor, at Minot AFB.  Accordingly, the top commander at Minot AFB wanted the interview of Plaintiff to occur "sooner rather than later."  This meant that OSI interviewed Plaintiff before talking to other parties with evidence, a decision that contrasted with OSI's normal practice of interviewing subjects only after interviewing all potential witnesses.

41.     Plaintiff accepted OSI's interview request, waived his Article 31, UCMJ, rights,[5]

---

[5] Article 31, UCMJ, 10 U.S.C. § 831, provides, *inter alia*, that no person subject to the UCMJ may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him and that no person subject to the UCMJ may interrogate or request any statement from an accused or a person suspected or an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement

and answered PD's questions.

42.      As PD interviewed Plaintiff, OSI agents searched his home.  Although the agents had authority to seize evidence, the only things they took were photographs.  Consequently, OSI could not perform additional inspections or tests on suspicious items to determine if any item had actually been previously repaired.  OSI also searched Plaintiff's office but only took photographs. PD later conceded that "[m]istakes were made" in how OSI conducted the investigation.  He added, "It could be construed as not good police work."

43.      Because of how OSI conducted its investigation, Plaintiff could not know the focus of the investigation.

44.      In the July 2017 interview with OSI, Plaintiff complained about the packing process and the delivery, including how he was provided with "at least two or three inventories" and a bingo sheet to try and figure out what was delivered.  He denied knowing whether all his items were actually packed into crates, emphasized that some crates had broken seals upon delivery, and explained how confusing it was to determine which items were actually delivered when they were labelled with stickers that did not match the inventory.  Plaintiff conceded that he might have mixed up numbers on the inventory but he denied claiming any item that was listed as missing if he knew it had been delivered.  However, he made mistakes, such as getting the inventory number wrong for filing a claim for items missing from a filing cabinet that were listed as not delivered on his inventory but which had actually been delivered and verified, as evidenced by the original inventory.

45.      Regarding a Fender speaker, Plaintiff told an investigator, "In 2011, the movers

---

regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

smashed in the front screen and broke the back outlet. Around 2013, I was able to pull the outlet/plug back out. In 2016, there were additional scratches to the speaker and I noticed that the rear plug had broken again. I put in a claim for the broken rear plug," or words to that effect.

46.     Plaintiff was unsure if he could substantiate every claimed item, but he offered to provide receipts, his Walmart.com password, and online order histories.

47.     Several months after the interview, Plaintiff supplemented the interview with a mostly single-spaced 21-page written statement with photographs. He admitted that he made some "mistakes" in his claim and during the OSI interview and tried to correct them with the written statement.

48.     Upon reviewing Plaintiff's claims, his statements, the results of OSI's search of Plaintiff's office, and the photographs taken by OSI agents, PD determined that there were several suspicious items in Plaintiff's possession. These items included a lawnmower, a television, weights, a model plane, and a cat tower. PD concluded that these items contradicted Plaintiff's claims that they were missing or damaged and he later briefed them to others as "smoking gun(s)."

49.     At trial, however, PD reversed his stance on these purported "smoking guns." First, he conceded that Plaintiff had never claimed that all of his weights were lost, just specific parts and the base. Therefore, OSI's discovery of weights that were missing parts and the base supported Plaintiff's claims. PD also acknowledged that Plaintiff owned several multiple cat-related items which suggested that Plaintiff could have lost one and still had others in his possession, and that a broken television in the garage may have been the same one he claimed as damaged, vice the undamaged television in Plaintiff's living room which had raised PD's suspicions. Regarding a model airplane that Plaintiff claimed was missing a wheel and had damage to its tail, PD conceded that the plane was indeed missing a wheel and that his photograph of the plane was taken at an

11

angle that could not clearly capture any tail damage.  Additionally, the lawnmower was a new one that Plaintiff had purchased and not the one that movers either packed or lost; the television was the same model but had a different serial number; and this particular cat tower was missing and never found.

B.     The Claims Process Overview

50.     It was not uncommon for servicemembers to submit claims for a large number of items or for high-value amounts.  Indeed, servicemembers were advised to seek the full replacement value for lost or damaged items.  A servicemember would compute the amount claimed based on the item's current cost (e.g., by checking prices on Google, Amazon, or the manufacturer's website) or its sentimental value.  Servicemembers frequently sought compensation amounts that were "not reasonable" for sentimental items but TSPs were not required to pay for the emotional value of an item.

51.     Servicemembers were permitted to seek the full replacement value for items they bought used and for items that were missing certain parts.  If an item was missing several parts, a servicemember would seek the full replacement value for the item based on each missing part.  Thus, for a table worth $600, but with two of its four chairs missing, a member could claim $600 for each missing chair.

52.     The TSP could elect not to pay each claim, but the servicemember was permitted to submit each claim.  Servicemembers are authorized to seek compensation for any new damage to a previously damaged item, including those items a servicemember previously repaired that incurred new in-transit damage on a subsequent move.

53.     Regardless of the amount claimed, a TSP was responsible only for damages or losses occurring in its possession.

54.     For all claims, a servicemember must provide substantiation for the requested amount of compensation.  The adjudicator, whether with the TSP or the MCL, may deny the claim without substantiation.  In any event, the requested compensation may mean very little to an adjudicator, as the adjudicator will do his or her own research to determine the value of a claimed item.

55.     When a service member files a Notice of Loss of Damages, the claims process is initiated.  A claimed amount is a starting point for negotiations, not an ending point.  The amount initially claimed is "irrelevant to the adjudication process."

C.      Plaintiff's Mental Health

56.     In preparation for the court-martial, Plaintiff was evaluated by Dr. MW, a forensic psychologist.  As the defense expert in forensic psychology, Dr. MW did not treat Plaintiff; instead, he evaluated Plaintiff and diagnosed him with (1) Hoarding Disorder with Excessive Acquisition and (2) Generalized Anxiety Disorder.

57.     Hoarding is strongly related to Obsessive Compulsive Disorder [OCD], however not everyone who has OCD is a hoarder.  Hoarding is highly genetic, typically manifests during adolescence, and tends to worsen over time.  The disorder affects decision-making, causing the hoarder to over-value personal belongings.  This over-valuation is not limited to sentimental or emotional attachment; rather, a hoarder may also believe his property has a higher monetary value that it actually does.

58.     Hoarders with the excessive acquisition modifier, like Plaintiff, also collect voluminous amounts of personal property, which they obtain not just through normal purchases, but also by frequenting garage sales, taking multiple copies of free or complimentary items, scouring alleyways and driveways for abandoned materials, and even "dumpster div[ing]."  These

hoarders compulsively save their amassed possessions, to the point where discarding anything "can be almost physically painful."

59.     To meet the diagnostic criteria for hoarding, the disorder must have a negative impact on an individual's life.  This could mean that a hoarder allows his home to become unsafe or unsanitary due to the overabundance of property, or it could damage a hoarder's professional, educational, or social opportunities.  Hoarding is akin to a co-dependency in that a hoarder may have a love/hate relationship with his acquisitions because of how they have adversely affected him, yet he is unable to get rid of them.  While a hoarder feels a greater attachment to his possessions than a non-hoarder, excessive accumulation can make it hard to keep track of what is in his home.

60.     Plaintiff also suffers from Generalized Anxiety Disorder [GAD].  This disorder is characterized by an individual who experiences anxiety more days than not for a variety of reasons for at least six months and this anxiety impairs the individual's social life, occupation, or other important areas.  The disorder also causes some amount of physical distress, such as fatigue, sleeplessness, or nausea.

61.     A hoarder who attaches great value to his possessions like Plaintiff might be inclined to become angry or frustrated by what he perceives as disrespect toward his property

62.     In April 2019, the military judge ordered a sanity board pursuant to Military Rule of Evidence [MRE] 706 based on the possible affirmative defenses of partial lack of mental responsibility and lack of mental responsibility.

63.     The board concluded that Plaintiff did not have a severe mental disease or defect at the time of the alleged offenses but concluded that he suffered from major depressive disorder and other related disorders at the time of the sanity board.

C.      The Court-Martial

64.     Plaintiff was tried by a general court-martial composed of officer members[6] at Peterson Air Force Base, Colorado, on November 20, 2018, January 8, 2019, May 9, 2019, October 28-November 8, 2019, and December 30, 2019.

65.     The government alleged that Plaintiff committed larceny against CWG for his 2014 household goods claim, attempted larceny against TMM for his 2017 claim, and providing four false official statements to an OSI investigator.

66.     In The Specification of Charge II, the Government charged Plaintiff with attempted larceny for the 2017 claim against TMM.  The Government alleged:

> That [Plaintiff] did, at or near Minot Air Force Base, North Dakota, between on or about 8 February 2017 and on or about 30 April 2017, attempt to steal money of a value greater than $500, the property of Total Military Management, by filing a household goods claim which included items for which [Plaintiff] was not entitled claims payment and would have resulted in such payment except for Total Military Management personnel discovering similarities between [Plaintiff's] 2017 household goods claim and [his] 2011 and 2014 household goods claims.

67.     During its case-in-chief, the Government asked KF, TMM's Claims Director, whether Plaintiff's previous claims prevented TMM from paying his claim:

> Trial Counsel [TC]:  Is it possible that but for the information you had about the 2011 and 2014 claims, that the 2017 claim could have been adjudicated differently?
>
> KF:  I think it's possible that it would have been adjudicated differently, but I think that there is a strong likelihood that there still would have been a similar outcome as this.

---

[6] RCM 502(a) provides that the members of a court-martial shall determine whether the accused is found guilty.  The members are collectively known as the "panel."  RCM 502(b) mandates that the president of a court-martial panel shall be the highest-ranking member of the panel. The president has the same duties as the other members and shall also preside over closed sessions of the members during their deliberations and shall speak for the members when announcing the verdict or requesting instructions from the military judge.

TC:  And why do you say that?

KF:  Based on the manner in which we moved the shipment and retained oversight of the shipment, claims – or shipments that we handle in this type of manner have not ever before led up to this kind of claim, and it would have been suspect at that time, regardless of the previous other claims.

68.    On cross-examination, KF reiterated her position:

Circuit Defense Counsel [CDC]: . . .  And, correct me if I get this wrong, but I believe your testimony was that you, even without that data, 2011 and 2014, both the claims, and in 2014 the claims and inspection report, we may have – you may have been at the same place.  Correct?

KF:  Yes.  I think there would have been a portion of the claim that we would have referred or transferred due to suspect [sic] that it was not a true and valid claim.

CDC:  And what portion is that, ma'am?

KF:  The missing, and in addition some of probably the damages, too.

CDC:  Okay.  And so you – and the reason you're – so standing alone, just looking at the 2017 claim, this was enough to deny large chunks of it, on its face?

KF:  On its face, yes.  We would have had some concerns.

CDC:  And what – and concerns that were exacerbated because looked a lot like what happened in the big sense in terms of number, and the number of items missing or damaged, correct?  It looked like 2011 in that sense?

KF:  No.  I mean, when – just – if we're just talking about the 2017 claim, the extent of damage for that claim on its own, with the way that it was crated and the condition of those crates and the oversight at origin and destination, it would have raised concerns on its own as a claim.

CDC:  What makes you think – what evidence do you have that there was less oversight in 2011 or 2014?

> KF:  I don't.  I'm just saying we would have had concern based on the 2017 claim without even anything to do with the other two.
>
> . . .
>
> CDC:  Okay.  So, ma'am, if we're looking at 2017 in a nutshell by itself, you had concerns based on our oversight and the claim itself, right?
>
> KF:  Yes.

69.     KF confirmed that TMM would not simply rubberstamp Plaintiff's claim just because he filed it; rather, TMM would seek "additional documentation to substantiate the claim."

70.     There was no limit to the number of times TMM could have gone back to Plaintiff for additional information, no limit on the type of evidence it could request, and no limit on how often it could seek to inspect the goods.

71.     No matter the amount Plaintiff sought for missing or damaged items, TMM could have offered him whatever it wanted to pay.

72.     In Specification 4 of Charge III, the Government charged Plaintiff with making a false official statement:

> That [Plaintiff] did, at or near Peterson Air Force Base, Colorado, between on or about 25 January 2018 and on or about 6 February 2018, with intent to deceive, make to Special Agent [PD], an official statement, to wit:  "In 2011, the movers smashed in the front screen and broke the back outlet.  Around 2013, I was able to pull the outlet/plug back out.  In 2016, there were additional scratches to the speaker and I noticed that the rear plug had broken again.  I put in a claim for the broken rear plug," or words to that effect, which statement was totally false, and was then known by [Plaintiff] to be so false.

73.     JM, the lead packer, testified that she was responsible for protecting her company, LSR, from liability for any missing or damaged items.

17

74.     JM testified that she annotated anything that was "scratched, chipped, worn, [or] broken" as LSR personnel packed Plaintiff's household goods.  She testified that she was explicitly tasked to flag any preexisting damage to Plaintiff's goods and that she followed these orders by annotating appropriate exception codes on the inventory and taking photographs.

75.     JM included two Fender speakers in the inventory, both of which she described as "dented."  She did not list either as "broken."  She photographed only the front of one speaker. This photograph shows a "3" sticker – the same number assigned to the claimed speaker in the inventory.  JM would not have taken the photograph if there was no damage to the speaker.

76.     The Government did not contest the evidence that this speaker was shipped in 2014. While the inventory for the 2014 move indicates that the speaker had minor preexisting damage, there is no reference to any damage near the rear plug outlet, damage that would presumably affect the speaker's ability to function and that would warrant annotation.

77.     Plaintiff did not claim any damage to his Fender speaker after the 2014 move.

78.     The Government offered no evidence that Plaintiff to support its contention that Plaintiff falsely reported that the repaired speaker broke again during the 2016 move.  JM testified that LSR explicitly tasked her to flag any preexisting damage to Plaintiff's household goods and that she followed these orders by annotating appropriate exception codes on the inventory and taking photographs.  Missing from her notes and photos is anything related to the back outlets of the claimed speaker.

79.     Neither party offered the speaker as evidence during trial.

80.     Shortly before findings were announced on November 8, 2019, Plaintiff's defense counsel and the prosecutor notified the military judge that Plaintiff had expressed specific suicidal ideations during the trial.  Counsel for both parties were concerned that Plaintiff would require

mental health care if convicted and they addressed the issue with the military judge in an out-of-court off-the-record conference pursuant to Rule for Courts-Martial [RCM] 802.

81.     Almost immediately after findings were announced, Plaintiff was voluntarily taken to the hospital on Fort Carson, Colorado, for observation and a mental health evaluation.

82.     Less than an hour after Plaintiff was admitted to the hospital, Plaintiff's defense counsel notified the Government and the military judge that Plaintiff expressed willingness to waive his presence at the presentencing hearing scheduled for the next day but that the defense counsel harbored doubts about Plaintiff's competence to make such a decision.

83.  On November 9, 2019, the Defense notified the military judge of its intent to move for a continuance and to seek a new sanity board, given that the hospitals treating psychiatrist was not a forensic psychiatrist who would assess Plaintiff's ability to assist in his defense.

84.     The military judge granted a continuance until December 30, 2019.

85.     Seventy-two hours after being admitted, Plaintiff was released and began an intensive outpatient mental heal treatment program at a civilian healthcare facility in Colorado Springs, Colorado.

86.     On December 13, 2019, the date that Plaintiff was scheduled to complete the outpatient program, his providers concluded that he should remain in treatment for another week and would require 24-hour monitoring to ensure his safety.

87.     On December 19, 2019, the Government moved for another RCM 706 sanity board because of concerns about Plaintiff's competence to proceed with the sentencing phase of trial. Over Defense objection, the military judge found that Plaintiff was competent to stand trial and denied the motion.

88.     The pre-sentencing hearing occurred on December 30, 2019.  The panel sentenced

Plaintiff to dismissal from the Air Force.

89.     A dismissal is highly stigmatizing and Plaintiff is statutorily barred from receiving any benefits from the United States Department of Veterans Affairs.

D.     Decisions by the CCA and the CAAF

90.     Plaintiff appealed his conviction and sentence to the United States Air Force Court of Criminal Appeals [CCA].  The three-judge panel affirmed the findings and sentence.  *United States v. Prescott*, 2022 CCA LEXIS 205 (A.F. Ct. Crim. App. Apr. 1, 2022) (unpub.)

91.     The CCA noted that Plaintiff's argument regarding the conjunctive language in the charged specification alleging attempted larceny – "and would have resulted in such payment except for [TMM] personnel discovering similarities between [Plaintiff's] 2017 household goods claim and [his] 2011 and 2014 household goods claims" – was his "strongest argument."  2022 CCA LEXIS at *43.

92.     Without any citation to a statute, caselaw, or rule of procedure or evidence, the CCA stated, "The reason why an attempt to commit an offense charged under Article 80, UCMJ, did not succeed is not an element of the offense of attempt, and was not required to be included in the specification."  *Id*. at *43-44.

93.     The CCA explained that the Government admitted it was "unclear" why it chose to include this "surplus" language in the specification.  *Id*. at *46.

94.     The CCA stated, "the question becomes whether the Government proved the 'surplus' language, notwithstanding KF's testimony, such that court members could find it beyond a reasonable doubt.  We conclude the evidence does support such a finding."  *Id*. at *47.

95.     The court reasoned that (1) "in light of the totality of the evidence, the members could have reasonably found unpersuasive KF's speculative opinion about what would have

happened to [Plaintiff's] 2017 claim if TMM had not had the information from his 2011 and 2014 claims" and (2) "even if the court members credited KF's speculation, taken as a whole her testimony indicated KF believed TMM would have paid part of [Plaintiff's] claim but for its knowledge of the 2011 and 2014 claims" in part because the total amount claimed for the Fender speaker, Bowflex weights, music stand, and plastic shelf unit was over $1,500.  *Id*. at *47-49. Accordingly, the members reasonably could have found that "TMM would have paid [Plaintiff] over $500.00 for fraudulent claims 'except for [TMM] personnel discovering similarities between [Plaintiff's] 2017 household goods claim and [his] 2011 and 2014 household goods claims' as charged."  *Id*. at *49.

96.     Plaintiff petitioned the Judge Advocate General [TJAG] for a new trial based on newly discovered evidence, pursuant to Article 73, UCMJ, 10 U.S.C. § 873, RCM 1210, and Air Force Instruction [AFI] 51-201, *Administration of Military Justice*.  Plaintiff averred that Dr. SG, his treating clinical psychologist since January 2021, had diagnosed him with complex post-traumatic stress disorder [PTSD] and obsessive-compulsive disorder and concluded that Plaintiff did not have the ability to form the specific intent to commit the offenses of attempted larceny and making a false official statement at the time that he allegedly committed these offenses.  Plaintiff also averred that these diagnoses were not discovered until after trial, and could not have been discovered before trial because the sanity board and the expert witness only evaluated Plaintiff but did not treat him.

97.     Plaintiff moved the CCA to reconsider its April 1, 2022, decision on the same basis as the Petition for a New Trial.  Plaintiff asserted that the new evidence supported his claim that he was entitled to present a defense based upon partial lack of mental responsibility, pursuant to RCM 916(k)(2).

98.    The AFCCA denied reconsideration and the petition for a new trial. *Prescott v. United States*, 2022 CCA LEXIS 343 (A.F. Ct. Crim. App. June 13, 2022) (unpub.).

99.    The CCA accepted that the newly discovered evidence – Dr. SG's diagnoses and opinion – were not discoverable before he started treating Plaintiff after the court-martial, but concluded that Plaintiff failed to demonstrate that Dr. SG's opinion, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result. *Id*. at *12.

100.    Plaintiff petitioned the CAAF for review of the CCA's decision denying a petition for a new trial. The CAAF denied review of the CCA's decision regarding the petition for a new trial and of the CCA's decision on the direct appeal. *United States v. Prescott*, 83 M.J. 93 (C.A.A.F. 2022). The CAAF also denied Plaintiff's petition for reconsideration. *United States v. Prescott*, 83 M.J. 250 (C.A.A.F. 2023).

E.    Failure to Contact Material Fact Witness

101.    After the Government preferred charges against Plaintiff, Plaintiff gave his defense attorney the name of Mr. AD, a witness who observed the condition of the Fender speaker on or about July 3, 2016. Plaintiff's Exhibit [Pl. Ex.] 1, Petition to the Secretary of the Air Force, at 5, 21.[7]

102.    On that date, AD assisted Plaintiff with moving items, including the Fender speaker, in preparation for the arrival of contractors who were tasked with repairing water damage to Plaintiff's home. *Id*. at 21-22.

103.    As AD began to move a pair of speakers, Plaintiff stated, "Be very careful, one of the outlets was fixed and you need to watch the cables in the back on that one," or words to that

---

[7] Personal identifiers have been redacted from this document, pursuant to Local Civil Rule 5.4(f).

effect.  AD examined the back of the speaker and observed that there were two black cables coming

out of the speaker.  Indeed, both speakers had cables attached to both rear outlets.  Plaintiff told

AD to move the speaker next to the desk and advised him to unplug the cables from the mixer and

wrap the cords around the speakers.  He told AD, "do not unplug the cables from the back of that

speaker as it took a while to fix the outlet."  *Id*. at 21.

104.    In 2018, AD read an article in the Air Force Times about the charges against

Plaintiff, including that Plaintiff was charged with an offense involving the speaker outlet.  This

article sparked AD's memory about observing the Fender speaker in July 2016.  *Id*.

105.    AD contacted Plaintiff, who referred AD to his legal team, specifically Plaintiff's

civilian defense counsel.  *Id*.

106.    Plaintiff advised his lead defense counsel that AD was a material fact witness.  *Id*.

at 5, 21.

107.    No one on Plaintiff's defense team contacted AD.  *Id*.

108.    In February 2022, Plaintiff petitioned the Secretary of the Air Force to remove the

sentence to dismissal.  Plaintiff included a November 6, 2020, affidavit from AD describing the

condition and appearance of the Fender speaker, an eagle figurine, and the music stands in 2016.

*Id*. at 1-2, 22-23.

## **CAUSES OF ACTION**

### **Count I – Legal Insufficiency**

109.    The averments of ¶¶ 1-79 and 88-95 are incorporated herein by reference.

110.    The Due Process Clause applies to courts-martial.

111.    Because the Government failed to prove beyond a reasonable doubt the essential

element of specific intent and the surplus element that it added to the charging language for

attempted larceny, the conviction and sentence violated due process and are invalid.

112.    Because the Government failed to prove beyond a reasonable doubt the essential elements that the statement was totally false, that Plaintiff knew it was false when he provided it, and that he made the statement with the intent to deceive, the conviction and sentence violated due process and are invalid.

### Count II – Denial of a Petition for a New Trial

113.    The averments of ¶¶ 80-89 and 96-100 are incorporated herein by reference.

114.    The Due Process Clause applies to courts-martial.

115.    Article 73, UCMJ, 10 U.S.C. § 873, allows petitions for new trials on the grounds of newly discovered evidence or fraud on the court.

116.    RCM 1210(f)2) provides that a new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that the evidence was discovered after the trial, the evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence, and the newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

117.    Because the CCA erred in concluding that Dr. SG's diagnoses of PTSD and OCD and his opinion that Plaintiff did not have the requisite specific intent to commit the offenses, if considered by a court-martial in light of all other pertinent evidence, would not probably produce a substantially more favorable result and the CAAF erred in denying review of this issue, the conviction and sentence violated due process and are invalid.

### Count III – Ineffective Assistance of Counsel

118.    The averments of ¶¶ 101-08 are incorporated herein by reference.

119.     The Sixth Amendment applies to courts-martial.

120.     Because Plaintiff's attorneys failed to contact a material witness who observed the condition of certain items in contention, including a Fender speaker, an eagle figurine, and music stands, their representation of Plaintiff fell measurably below that ordinarily expected of fallible attorneys and their failure prejudiced Plaintiff, in violation of the Sixth Amendment, such that his conviction and sentence are invalid.

## RELIEF REQUESTED

121.     Plaintiff prays that the Court enter judgment –

(a) declaring that his conviction and sentence were obtained in violation of the Fifth Amendment, Sixth Amendment, 10 U.S.C. § 873, and R.C.M. 1210(f)(2);

(b) ordering that his conviction and sentence be expunged and that all rights, property, and privileges of which he has been denied by reason of the conviction be restored; and

(c) granting such other and further relief as may in the circumstances be just and proper.

Respectfully submitted,

/s/ *William E. Cassara*
WILLIAM E. CASSARA
D.C. Bar No. GA0034
William E. Cassara, PC
PO Box 2688
Evans, GA 30809
(706) 860-5769
bill@courtmartial.com
Attorney for Plaintiff

June 28, 2024

Serve:        Attorney General of the United States
              United States Attorney for the District of Columbia
              Secretary of the Air Force